IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-307

No. COA20-608

Filed 6 July 2021

Wake County, Nos. 18 CRS 215090-92

STATE OF NORTH CAROLINA

v.

KIMBERLY BRANTLEY-PHILLIPS

Appeal by Defendant from Judgments entered 9 September 2019 by Judge
Rebecca W. Holt in Wake County Superior Court. Heard in the Court of Appeals 12
May 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Ryan F.
Haigh, for the State.*

*Benjamin J. Kull for defendant-appellant.*

HAMPSON, Judge.

**Factual and Procedural Background**

Kimberly Brantley-Phillips (Defendant) appeals from Judgments entered 26
September 2019 after a jury found her guilty of ten counts of Obtaining Property by
False Pretense. The Record tends to reflect the following:

Between 20 November 2014 and 25 January 2018, Defendant made forty-eight
online payments to the North Carolina Department of Revenue (NCDOR), which

were "applied to Transaction Lists, or NCDOR ledgers, for tax years 2011 and 2014." These payments—which were made on Defendant's NCDOR taxpayer account, under Defendant's name, and in association with Defendant's Social Security Number— came from a total of ten banks. The routing numbers associated with each online payment all corresponded to valid bank routing numbers. Ultimately, each payment was rejected: one for insufficient funds, and the remaining forty-seven by reason of "Invalid Account[s][.]" These payments would have amounted to a total of $559,549.71.

¶ 3    NCDOR's internal online filing and payment system registered each payment, along with the pertinent personal information. After each payment was registered, Defendant's taxpayer account would be positively credited "virtually immediately[.]" Then, before it had time to realize these payments were invalid,[1] NCDOR would "either sen[d] money to other tax years to pay liabilities owed[,]" or "sen[d] [money] to external agencies to pay liabilities owed to them[.]" On a few occasions following these payments, NCDOR also stopped garnishments of Defendant's wages, previously put in place to recoup existing debts on Defendant's taxpayer account. Moreover, because Defendant's alleged payments resulted in overpayment on

---

[1] The amount of time needed for NCDOR to receive notice from alleged payment source bank that the account in question is either invalid or has insufficient funds is "three to seven . . . business days depending on holidays and weekends . . . ."

Defendant's tax account for the 2014 account period, Defendant received four refund checks, the first three of which she was able to cash before NCDOR realized Defendant's payments were invalid and issued a stop payment order.

¶ 4 In July 2017, Karli Hahn (Agent Hahn), a special agent in the criminal investigation section of NCDOR, was assigned to investigate Defendant's online payment activity. In February 2018, Agent Hahn spoke with Defendant directly. Agent Hahn testified, over the course of her interview with Defendant, Defendant admitted: she knew the payments in question and associated bank accounts were false; she had cashed the refund checks despite knowing she was not entitled to the money; and had made the invalid payments to "stop the wage garnishments from occurring[.]" "[E]ventually she realized that she was getting refund checks, so then she decided she wanted to continue the cycle."

¶ 5 On 14 August 2018, three warrants were issued for Defendant's arrest charging Defendant with a total of ten counts of Obtaining Property by False Pretense. The State subsequently gave notice it intended to use the remainder of the forty-eight payments as evidence of "an ongoing and substantially interconnected criminal enterprise." The warrants alleged: Defendant had submitted online filings to NCDOR in 2014, 2015, and 2016, respectively; had made these payments from invalid bank accounts under false pretenses; and had obtained or attempted to obtain a total of $1,092.48, $4,456.23, and $20,248.16, respectively.

¶ 6        On 9 October 2018, a grand jury in Wake County indicted Defendant on ten counts of Obtaining Property by False Pretense, alleging she had obtained or attempted to obtain "United States Currency[.]" On 30 July 2019, Defendant was indicted on the same charges via superseding indictments, this time alleging Defendant had obtained or attempted to obtain "a credit on her North Carolina Department of Revenue account in the approximate amount[s]" of $2,256.16, $35,500, and $40,000, respectively.

¶ 7        The matter came on for trial before a jury in Wake County Superior Court on 23 September 2019. At the close of the State's evidence, Defendant moved to dismiss all charges for insufficient evidence. The trial court denied the Motion, finding "there [wa]s substantial evidence as to each element of each charge charged in this case[.]" Defendant renewed her Motion to Dismiss at the close of all evidence. The trial court again denied the Motion. The trial court subsequently instructed the jury for each of the ten counts:

> If you find from the evidence beyond a reasonable doubt . . . the Defendant made a representation and that this representation was false, that this representation was calculated and intended to deceive, that the alleged victim was in fact deceived by it, and that the Defendant thereby obtained property or a thing of value from the alleged victim, it would be your duty to return a verdict of guilty.

¶ 8        On 26 September 2019, the jury found Defendant guilty on all ten counts of Obtaining Property by False Pretense. The trial court entered Judgments in each of

the three cases. The first Judgment (file number 18 CRS 215090) consolidated four of the convictions and sentenced Defendant in the presumptive range of six-to-seventeen months. The second Judgment (file number 18 CRS 215091) consolidated three of the convictions, sentencing Defendant to a consecutive, active term of six-to-seventeen months, suspended for a period of thirty-six months. The third Judgment (file number 18 CRS 215092) consolidated the remaining three convictions sentencing Defendant to a further consecutive term of six-to-seventeen months, also suspended. As a monetary condition of probation in 18 CRS 215091, Defendant was ordered to pay restitution in the amount of $14,506.56. A separate notation in the Judgment entered in 18 CRS 215092 reflects it applies the same conditions of probation as in 18 CRS 215091. Defendant gave timely, oral Notice of Appeal in open court, consistent with N.C.R. App. P. 4.

## **Issues**

The dispositive issues on appeal are whether: (I) the trial court erred in denying Defendant's Motion to Dismiss the charges of Obtaining Property by False Pretense for insufficient evidence; (II) the jury instructions varied fatally from the indictments by failing to specify the credits to Defendant's NCDOR account as the "thing of value" obtained; and (III) the trial court committed error in ordering Defendant to pay restitution in the amount of $14,506.56.

### Analysis

#### I.     Motion to Dismiss

*A.  Standard of Review*

"Upon [a] defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense.  If so, the motion is properly denied." *State v. Fields*, 265 N.C. App. 69, 71, 827 S.E.2d 120, 122 (2019), *review allowed, writ allowed*, 830 S.E.2d 816 (N.C. 2019), *and aff'd as modified*, 374 N.C. 629, 843 S.E.2d 186 (2020) (citation and quotation marks omitted).  "Substantial evidence is [the] amount . . . necessary to persuade a rational juror to accept a conclusion."  *State v. Golder*, 374 N.C. 238, 249-50, 839 S.E.2d 782, 790 (2020) (alterations in original; quotations marks omitted) (quoting *State v. Mann*, 355 N.C. 294, 301, 560 S.E.2d 776, 781 (2002)).  "In evaluating the sufficiency of the evidence to support a criminal conviction, the evidence must be considered 'in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom.' " *Id.* at 249-50, 839 S.E.2d at 790 (quoting *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980)).  "Whether the State presented substantial evidence of each essential element of the offense is a question of law; therefore, we review the denial of a motion to dismiss de novo." *Id.* at 250, 839 S.E.2d at 790 (quotation marks omitted) (quoting

*State v. Chekanow*, 370 N.C. 488, 492, 809 S.E.2d 546, 550 (2018)).

### B. *Obtaining Property by False Pretense*

¶ 11      Our General Statutes set out the felony of Obtaining Property by False Pretense as follows:

> If any person shall knowingly and designedly by means of any kind of false pretense whatsoever, whether the false pretense is of a past or subsisting fact or of a future fulfillment or event, obtain or attempt to obtain from any person within this State any *money, goods, property, services, chose in action, or other thing of value* with intent to cheat or defraud any person of such money, goods, property, services, chose in action or other thing of value, such person shall be guilty of a felony[.]

N.C. Gen. Stat. § 14-100(a) (2019).

> Our Supreme Court has defined the elements of the crime of obtaining property by false pretenses in N.C. Gen. Stat. § 14-100 as follows: "(1) a false representation of a subsisting fact or a future fulfillment or event, (2) which is calculated and intended to deceive, (3) *which does in fact deceive,* and (4) by which one person *obtains or attempts to obtain value from another*."

*State v. Bradsher*, ___ N.C. App. ___, ___, 852 S.E.2d 716, 729 (2020) (emphasis added) (quoting *State v. Cronin*, 299 N.C. 229, 242, 262 S.E.2d 277, 286 (1980)).

¶ 12      Here, Defendant argues the trial court erred in denying her Motion to Dismiss on the basis the State failed to present substantial evidence that Defendant's positive credits to her NCDOR taxpayer account constituted "property or a thing of value," or that NCDOR was deceived by Defendant's invalid payments.

### 1. *Evidence Defendant Obtained Property or a Thing of Value*

¶ 13    Defendant first argues the State presented insufficient evidence to establish Defendant obtained "property or a thing of value." Specifically, Defendant argues the credit to Defendant's taxpayer account resulting from her invalid payments does not constitute "property or a thing of value." In fact, Defendant contends "there [i]s no evidence that [Defendant] received any actual, real-world value from any of the ten indicted transactions."

¶ 14    As to all which the term "thing of value" may encompass, for the purpose of proving the offense of Obtaining Property by False Pretense, "all that our law requires is that the defendant obtain[] or attempt[] to obtain anything of value." *State v. Golder*, 257 N.C. App. 803, 813, 809 S.E.2d 502, 509 (2018), *aff'd as modified*, 374 N.C. 238, 839 S.E.2d 782 (2020) (alterations in original) (citation and quotation marks omitted); *see also Golder*, 374 N.C. at 252-53, 839 S.E.2d at 792 ("The fact that the statute imparts criminal liability when a defendant even *attempts* to obtain *any* 'other thing of value' guides this Court in deciding to apply a broader definition of 'thing of value' than suggested by defendant.") " 'Anything' is the most broad term one can use to define the class of valuable items that could satisfy this element, and that factual determination [i]s for the jury." *Golder*, 257 N.C. App. at 813, 809 S.E.2d at 509.

¶ 15    In *Golder*, "[t]he indictment arose from allegations that [the] defendant and Kevin Ballentine, a public employee with the Wake County Clerk's Office, devised a

scheme in which [the] defendant would pay Ballentine to alter or falsify court documents to secure remission of bail bond forfeitures." *Golder*, 374 N.C. at 240, 839 S.E.2d at 784. The defendant argued the State had not shown he had obtained "a thing of value" "because the fraudulent representations merely resulted in the 'elimination of a potential future liability.' " *Id.* at 252, 839 S.E.2d at 792. Our Supreme Court reasoned:

> Assuming *arguendo* that the elimination of a potential future liability does not constitute "property" under N.C.G.S. § 14-100, that result is not dispositive . . . . At a minimum, this was an attempt to reduce the amount that defendant's bail bond company was required to pay as surety for forfeited bonds and, therefore, constitutes a "thing of value" under N.C.G.S. § 14-100.

*Id.* at 252-53, 839 S.E.2d at 792. Accordingly, the Supreme Court concluded the State had provided sufficient evidence to support the defendant's conviction of Obtaining Property by False Pretense. *Id.* at 253, 839 S.E.2d at 792.

¶ 16        Though the context of our case differs somewhat from *Golder*, the respective outcomes are not significantly distinguishable. Here, the State provided testimony from Agent Hahn and Defendant's NCDOR transactions list for the 2011 and 2014 tax years. The evidence, viewed in the light most favorable to the State, provides a clear picture: Defendant's fraudulent payments positively credited her taxpayer account "virtually immediately[.]" These credits, in turn, led NCDOR to provide credit toward Defendant's liabilities and to credit Defendant's liabilities to other

agencies, to put a hold on its garnishments of Defendant's wages, and to submit four refund checks to Defendant, three of which she successfully cashed. Thus, the benefit Defendant incurred from her purported "payments" was the elimination or diminution of liabilities owed to NCDOR and other agencies, in addition to the tangible benefit of cash by way of the refund checks. Moreover, Defendant herself admitted she committed these offenses to "stop the wage garnishments from occurring," and deliberately "continue[d] the cycle" to redeem additional refund checks. "At a minimum," then, Defendant's efforts were "an attempt to reduce the amount that [D]efendant[] . . . was required to pay" NCDOR. *See id.* at 253, 839 S.E.2d at 792. Thus, the State brought forth sufficient evidence to "persuade a rational juror to accept [the] conclusion" Defendant, by obtaining credits to her taxpayer account by way of her invalid payments, had indeed obtained "property or a thing of value." *See id.* at 249, 839 S.E.2d at 790 (citation omitted).

2. *Evidence NCDOR Was Deceived by Defendant's Invalid Payments*

Defendant next argues the State failed to present substantial evidence showing NCDOR was, in fact, deceived by Defendant's invalid payments to her taxpayer account.

Here, the evidence at trial showed, following Defendant's invalid payments, because "there were a bunch of online payments made on the Defendant's account

that [NCDOR] thought [it] received the funding for[,]" NCDOR "either sent money to other tax years to pay liabilities owed or . . . sent it to external agencies to pay liabilities owed to them, as well, when in actuality [NCDOR] never received the funding from [Defendant] or these bank accounts because they were fake." NCDOR stopped garnishments on Defendant's wages on multiple instances following Defendant's false payments. Moreover, some of Defendant's invalid payments led NCDOR to believe, erroneously, Defendant had overpaid, thus resulting in the issuing of the four refund checks to her.

¶ 19 Thus, again, the State brought forth sufficient evidence to "persuade a rational juror to accept [the] conclusion" NCDOR was deceived by Defendant's false payments. *See id.* at 249, 839 S.E.2d at 790 (citation omitted). The trial court did not err in denying Defendant's Motion to Dismiss for lack of sufficient evidence.

## II.    Jury Instructions

¶ 20 Defendant further argues the trial court's instructions to the jury—using the term "thing of value" without identifying the thing of value as the credits to Defendant's taxpayer account, as specifically described in the superseding indictments—varied fatally from the indictments and were thus erroneous.

### A. Standard of Review

¶ 21 As a preliminary matter, the parties dispute whether we should apply plain

error or de novo review. Defendant failed to preserve a specific objection on the issue of jury instructions, a fact which she concedes. Defendant contends, however, the Supreme Court in *Golder* "assumed without deciding" that "issues concerning fatal variance are preserved by a general motion to dismiss." Thus, because Defendant did make a Motion to Dismiss, which was renewed at the close of all evidence, Defendant claims the issue is preserved and subject to de novo review. Conceding, however, the Supreme Court "did not firmly settle that question," in the alternative, Defendant seeks plain error review. The State, for its part, argues Defendant's claim regarding jury instructions "is not related to the sufficiency of evidence presented at trial," and thus, as unpreserved, her claim must be reviewed for plain error.

¶ 22        Although *Golder* did not address this specific question, our Court has noted, in light of *Golder*: "any fatal variance argument is, essentially, an argument regarding the sufficiency of the State's evidence." *State v. Gettleman*, ___ N.C. App. ___, ___, 853 S.E.2d 447, 454 (2020) (citation omitted). We further reasoned: "[o]ur Supreme Court made clear in *Golder* that 'moving to dismiss at the proper time . . . preserves *all* issues related to the sufficiency of the evidence for appellate review.' " *Id.* (quoting *Golder*, 374 N.C. at 249, 839 S.E.2d at 790). Specifically, in *Gettleman* we determined the defendant failed to preserve an argument that the jury instructions and indictment in that case created a fatal variance precisely because the Defendant failed to move to dismiss the charge in question. *Id.* Here, unlike in *Gettleman*,

Defendant did timely move to dismiss all charges, and thus, under the rationale of *Gettleman*, it would appear Defendant did preserve this argument.[2] *See id.* Without so deciding, and for purposes of review of this case, we employ de novo review. *See id.*

### B. *Whether the Jury Instructions Varied Fatally from the Indictments*

¶ 23 Defendant argues: "[t]o the extent th[e] [jury] instructions allowed the jury to conclude that the $1,889.80 in offsets, as described during Agent Hahn's testimony, constituted the requisite 'thing of value' for any of the ten charges, the instructions varied fatally from the indictments." In other words, Defendant argues, to the extent the jury may have been misled by the instructions to confuse "offsets" with "credits" as the "thing of value" allegedly obtained by Defendant, the jury instructions varied fatally from the superseding indictments and were thus erroneous.

¶ 24 "It is a rule of universal observance in the administration of criminal law that a defendant must be convicted, if convicted at all, of the particular offense charged in the bill of indictment." *State v. Locklear*, 259 N.C. App. 374, 380, 816 S.E.2d 197, 202

---

[2] The State's point is well taken. It is not clear our Supreme Court necessarily intended a Motion to Dismiss based on insufficient evidence to preserve an argument that the jury instructions varied from the indictment. *See generally State v. Gregory*, 342 N.C. 580, 467 S.E.2d 28 (1996) (reviewing for plain error); *State v. McNair*, 253 N.C. App. 178, 799 S.E.2d 631 (2017) (reviewing for plain error); *State v. Locklear*, 259 N.C. App. 374, 816 S.E.2d 197 (2018) (reviewing for plain error); *State v. Lu*, 268 N.C. App. 431, 836 S.E.2d 664 (2019) (reviewing for plain error).

(2018) (quotation marks omitted) (quoting *State v. Barnett*, 368 N.C. 710, 713, 782 S.E.2d 885, 888 (2016)). "Thus, '[i]f the indictment's allegations do not conform to the "equivalent material aspects of the jury charge," this discrepancy is considered a fatal variance.' " *Id.* (alteration in original) (quoting *State v. Taylor*, 304 N.C. 249, 274, 283 S.E.2d 761, 777 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398, *rehr'g denied*, 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983)). "It is clearly the rule in this jurisdiction that the trial court should not give instructions which present to the jury possible theories of conviction which are . . . not charged in the bill of indictment." *Id.* at 383, 816 S.E.2d at 204 (alteration in original; quotation marks omitted) (quoting *Taylor*, 304 N.C. at 274, 283 S.E.2d at 777). "Nevertheless, this Court has stated that '[a] jury instruction that is not specific to the misrepresentation in the indictment is acceptable so long as the court finds "no fatal variance between the indictment, the proof presented at trial, and the instructions to the jury." ' " *Id.* (alteration in original) (quoting *State v. Ledwell*, 171 N.C. App. 314, 320, 614 S.E.2d 562, 566 (2005)). For example, "[i]n [*State v.*] *Clemmons*, this Court held the trial court did not err in failing to mention the exact misrepresentation alleged in the indictment in the jury instruction because the State's evidence corresponded to the allegation in the indictment." *Id.* (citing *State v. Clemmons,* 111 N.C. App. 569, 578, 433 S.E.2d 748, 753 (1993)).

*State v. Locklear* provides another pertinent example; there, at issue was

whether there was a fatal variance between the indictment for Obtaining Property

by False Pretense and the jury instructions. *Id.* at 380, 816 S.E.2d at 202. There,

the indictment specified the false pretense of "filing a fire loss claim under the

defendant's home owner insurance policy, when in fact the defendant had

intentionally burned her own residence," whereas the jury instructions did not make

such specifications, but instead provided "that the jury must find 'that the [d]efendant

made a representation to another[,]' 'that the representation was false[,]' and 'the

representation was calculated and intended to deceive.' " *Id.* at 380-81, 816 S.E.2d at

203 (second and third brackets in original). In fact,

> [d]uring the charge conference, the parties agreed that the court
> would instruct the jury on obtaining property of value of $100,000
> or greater by false pretense and the lesser offense of obtaining
> property by false pretense where value is not at issue. The trial
> court was informed that both offenses were included in the same
> pattern jury instruction. The trial court then instructed the jury
> pursuant to pattern instruction N.C.P.I.—Crim. 219.10A without
> specifying the false pretense alleged in the indictment.

*Id.* "The jury ultimately convicted [the] defendant of the lesser obtaining property by

false pretense offense." *Id.* at 381, 816 S.E.2d at 203. Our Court analyzed:

> evidence was introduced at defendant's trial of various
> misrepresentations in defendant's insurance claim besides her
> denial that she had anything to do with setting the fire. Precisely,
> in addition to evidence of the misrepresentation alleged in the
> indictment—"filing a fire loss claim under the defendant's home
> owner insurance policy, when in fact the defendant had
> intentionally burned her own residence"—evidence was
> introduced that defendant signed her ex-husband's name on a

deed, overstated the personal items allegedly destroyed in the fire, and sought money for rent that was not used for rent. Both defendant and the State have acknowledged evidence of these misrepresentations.

*Id.* at 383-84, 816 S.E.2d at 205. Our Court further reasoned:

> [w]here there is evidence of various misrepresentations which the jury could have considered in reaching a verdict for obtaining property by false pretense, we hold the trial court erred by not mentioning the misrepresentation specified in the indictment in the jury instructions for the offense.

*Id.* at 384, 816 S.E.2d at 205. Then, our Court concluded:

> Upon review, we agree with defendant that absent the trial court's error, it is likely the jury would have reached a different verdict for the obtaining property by false pretense charge. If the trial court's instructions had limited the jury's consideration to "filing a fire loss claim under the defendant's home owner insurance policy, when in fact the defendant had intentionally burned her own residence," it is unlikely the jury would have found defendant guilty because the jury found defendant not guilty of occupant or owner setting fire to a dwelling house. The instructions given by the trial court allowed the jury to consider any misrepresentation by defendant as a basis for a guilty verdict for obtaining property by false pretense . . . . Because the trial court's erroneous instructions allowed the jury to convict defendant on a theory not alleged in the indictment and it is unlikely the jury would have convicted defendant on the theory alleged in the indictment, we hold the error had a probable impact on the jury's finding defendant guilty of obtaining property by false pretense. The trial court plainly erred.

*Id.* at 384-85, 816 S.E.2d at 205.

Here, the alleged variance between the superseding indictments and the jury instructions arises from what constituted the "thing of value" requisite in charging

Defendant for Obtaining Property by False Pretense. As Defendant concedes, the superseding indictments were very clear in alleging the "thing of value" obtained by Defendant in each of the ten charges was in the form of "credit[,]" enumerating each of the ten transactions at issue along with its respective date, time, and monetary amount credited to Defendant's NCDOR account.[3] Conversely, the trial court's instructions did not make reference to any "credits," but instead allowed the jury to convict if it found beyond a reasonable doubt Defendant had "obtained property or a thing of value from the alleged victim" for each of the ten counts. To the extent the jury instructions do not match the exact language used within the superseding indictments, Defendant's argument is not entirely without merit. *See id.* at 380, 816 S.E.2d at 202. Defendant, however, contends these instructions allowed the jury to understand the "offsets," as described by Agent Hahn, to constitute the "thing of value" obtained by Defendant, when "none of the offsets matches the amount of any of the 'credits' described in the superseding indictments." This portion of Defendant's argument is inapposite.

¶ 27    In the instances in which Agent Hahn makes references to "offsets"—

---

[3] Despite this concession, in support of her argument, Defendant cites *State v. Jones*, 367 N.C. 299, 758 S.E.2d 345 (2014) (in which our Supreme Court concluded that an indictment for Obtaining Property by False Pretense alleging the defendant obtained "services" was insufficient) and *State v. Everette*, 256 N.C. App. 244, 807 S.E.2d 168 (2017) (in which the indictments charging the defendant with obtaining credit of an unspecified amount were insufficient). These cases are inapposite to the issue presented here.

particularly those passages upon which Defendant's argument relies—she appears to use the term informatively to explain dollar amounts in the State's exhibits, as exemplified in the following transcript excerpt:

> Q. Okay. And I'm going to show you the third page of Exhibit 2. Could you please walk the jury through the pertinent entries on that.
>
> A. Yep. Again you can see on line one where a payment was made for just over $2,200. And then you can see shortly after we received -- we backed out that payment because again, the funds were never received. And then we sent -- these are actually offsets that were received from other payments [Defendant] made and other tax years. So we had a negative balance there and so we took other payments that [Defendant] made another tax year and applied it to this in order to, you know, alleviate [Defendant's] tax due to [NCDOR].
>
> Q. Okay. Can you just remind the jury what an offset is.
>
> A. Yep. Again, the offset, it can occur in two separate ways. Like I was just explaining, let's say in 2011 [Defendant] owes an amount of money and she made a payment to apply to another tax year. If that payment that [Defendant] submitted for the other tax year is an excess amount of what she owed for that tax year, [Defendant] owes another tax year money. So in this instance, 2011, we'll apply that over -- overage of money to 2011 to alleviate the tax liability. And then again, it can also be to an external agency, IRS, government, university.
>
> Q. So in this circumstance [Defendant] allegedly made a payment for another tax year and had a positive balance.
>
> A. Right. Yes.

Moreover, Agent Hahn's testimony makes it clear that Defendant did not obtain offsets as a "thing of value":

> Q. Okay. And are you asserting that the Defendant received anything more than a credit on her tax account? Well, initially the refund checks and the offsets that she gets credit for, that all stems from a positive credit on her account in this window, right?
>
> A. Yes, sir.

The State's evidence—Agent Hahn's testimony—is indicative that the alleged "thing of value" of the felony charged is the temporary credit to Defendant's NCDOR account, not the offsets nor the refund checks resulting therefrom.

Furthermore, the State's case was consistent with the superseding indictments, in that it alleged the "thing of value" obtained by Defendant was in fact "credit," as illustrated in the State's closing argument:

> We know that the Department of Revenue got those payments and [NCDOR] perceived them to be legitimate and gave the Defendant's account credit for those payments. And the Defendant thereby obtained property or a thing of value.
>
> Now, I want to talk about that, because the evidence in this case is a little bit confusing . . . . So the thing of value in this case is that credit in her account. So on a particular day if she puts in a payment for $2,256, it's the credit of $2,256 that we're talking about . . . .
>
> . . . .
>
> But the reason that I'm clarifying this is because you will be asked to consider . . . 10 specific actions at specific times. And I don't want to confuse you with the difference between the credit for the payments on one side, which is what the State is alleging here is the thing of value, and the paying off the debts and the checks that were cashed later, because those are effects or a natural outcome to the thing of value. So what we are charging

on that particular date is related to the actual payment and the credit associated with that. So hopefully that's clear.

¶ 30    Moreover, although the jury instructions did not specify, by way of using the word "credit," that the "thing of value" allegedly obtained in each of the ten counts were credits to Defendant's NCDOR account, the trial court was otherwise very specific in enumerating each count individually, distinguishing each of the ten transactions by date and time, and instructing the jury for each of those counts that, if it found from the evidence beyond a reasonable doubt that Defendant "made a representation and that this representation was false, that this representation was calculated and intended to deceive, that the alleged victim was in fact deceived by it, and that the Defendant thereby obtained property or a thing of value from the alleged victim," it should convict.

¶ 31    In fact, unlike in *Locklear*, where "[t]he instructions given by the trial court allowed the jury to consider any misrepresentation by [the] defendant as a basis for a guilty verdict for obtaining property by false pretense[,]" here, the trial court's instructions did not allow the jury such broad bandwidth, but were instead careful instructions as to each of the ten transactions at issue. *Locklear*, 259 N.C. App. at 384, 816 S.E.2d at 205. Further, the trial court provided clear limiting instructions regarding the extent to which evidence of the thirty-eight remaining payments, the three bad checks, and Defendant's cashing or attempt to cash the checks may have

been considered.[4]  Lastly, in her argument, Defendant relies upon case law in which it was the indictment, rather than the jury instructions, that was insufficiently specific and thus variant from the jury instructions; here, as analyzed, that is simply not the case.

¶ 32    Thus, because "the State's evidence corresponded to the allegation[s] in the indictment[s]" and there is consistency between "the indictment[s], the proof presented at trial, and the instructions to the jury[,]"  there was no fatal variance between the superseding indictments and the jury instructions.  *See id.* at 383, 816 S.E.2d at 204 (citations and quotation marks omitted).  Therefore, the trial court's jury instructions were not erroneous.  *See id.*

---

[4] In these instructions, the trial court advised the remaining thirty-eight invalid payments were received solely for the purpose of showing, if the jury found that the transactions did indeed occur, the identity of the person who made the payments, and to show "Defendant had a motive for the commission of the crime charged in this case, that the Defendant had the knowledge, intent, or preparation to commit the crime charged, that there existed in the mind of the Defendant a plan, scheme, system or design involving the crime charged in this case, or the absence of mistake or accident."  Evidence of the three bad checks was received for the limited purpose "of showing that the Defendant had the intent or knowledge to commit the crime charged in this case, that there existed in the mind of the Defendant a plan, scheme, system or design involving the crime charged in this case, that the Defendant had the opportunity to commit the crime, preparation, or the absence of mistake."  Evidence of Defendant's cashing or attempting to cash the refund checks was received for the limited purpose "of showing that the Defendant had a motive for the commission of the crime charged in this case, that the Defendant had the intent or knowledge to commit the crime charged in this case, that there existed in the mind of the Defendant a plan, scheme, system or design involving the crime charged in this case, that the Defendant had the opportunity to commit the crime, preparation, or the absence of mistake."

III.     Restitution

In her final argument, Defendant argues the trial court erred in ordering Defendant to pay restitution of $14,506.56 for the State's losses as a condition of probation in 18 CRS 215091 and 18 CRS 215092 because there was no evidence those losses resulted from the offenses for which Defendant was convicted.

"On appeal, we review de novo whether the restitution order was supported by evidence adduced at trial or at sentencing." *State v. Wright*, 212 N.C. App. 640, 645, 711 S.E.2d 797, 801 (2011) (citation and quotation marks omitted; emphasis omitted). With respect to this claim, the State concedes the trial court erred in ordering Defendant to pay $14,506.56 in restitution. We agree, and consequently we vacate the Judgments in 18 CRS 215091 and 215092 and remand solely for resentencing on this issue. *See, e.g.*, *State v. Santillan*, 259 N.C. App. 394, 396, 815 S.E.2d 690, 692 (2018) (vacating the defendant's two sentences and remanding for a new sentence hearing upon the State's concession "the trial court failed to make sufficient findings to support the two sentences").

## **Conclusion**

Accordingly, for the foregoing reasons, we conclude there was no error at the trial of Defendant. However, we vacate the Judgments in 18 CRS 215091 and 18 CRS 215092 and remand those matters for resentencing on the issue of restitution, if any, to be paid by Defendant as a monetary condition of probation.

NO ERROR IN PART; VACATED IN PART AND REMANDED.

Judges TYSON and WOOD concur.